CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
DEC 0 8 2005
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| PAMELA DOTSON, | CASE NO. 3:04CV10099 |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| LERLA GEORGETTE JOSEPH, M.D., *et al.*, | |
| | By: B. WAUGH CRIGLER |
| Defendants. | U.S. MAGISTRATE JUDGE |

Before the court is defendants' September 16, 2005 Motion for Summary Judgment and the responses thereto. The motion has been referred to the undersigned under the authority of 28 U.S.C. § 636(b)(1)(B) to render to the presiding District Judge a report setting forth findings, conclusions and recommendations for its disposition. For the reasons that follow, the undersigned will RECOMMEND that the presiding District Judge enter an order GRANTING defendants' Motion for Summary Judgment as to plaintiff's Eighth Amendment claim against Lora Carver, and DISMISSING that claim, but DENYING the motion in all other respects.

**PARTIES AND CLAIMS**

Pamela Dotson has brought this action against Prison Health Services, Inc. ("PHS")[1], Lerla G. Joseph, M.D.("Joseph"), and Lora Carver, R.N. ("Carver") (collectively referred to a "defendants").[2] Plaintiff claims in Count I that, Joseph and Carver were deliberately indifferent to

---

[1] PHS is a Tennessee corporation which provided medical services to inmates at FCCW during plaintiff's incarceration. Dr. Joseph and Carver were employees of PHS during the relevant time period. (Defendants' Memorandum in Support, p. 7.)

[2] Barbara J. Wheeler, Correctional Officer Payne, Correctional Office Fountain, Correctional Officer Goodson, Huffman Chasse, Rice, and Jones also were named as defendants but subsequently were dismissed from the case. (Dkt Rpt Document Nos. 58, 71.)

her serious medical need, in violation of her Eighth Amendment rights, while she was incarcerated at Fluvanna Correctional Center for Women ("FCCW").[3] In Count II, plaintiff asserts that Joseph was negligent in providing her medical care, in violation of the applicable state law standard of care, and she seeks to impose liability on PHS under the state law doctrine of *respondeat superior*. The complaint, as amended, sets forth detailed factual assertions which will be more fully developed as the undersigned addresses the facts of the case.

## BACKGROUND

On June 2, 2003 plaintiff fell from her bunk at FCCW and landed on her left wrist. She was taken to the medical unit of the prison for x-rays. Shortly thereafter, correctional officers transported her to the University of Virginia Hospital Emergency Department ("Hospital," "UVa" or "ER") where doctors determined that plaintiff had fractured her left radius and ulnar. The doctors set her wrist and placed it in a splint, and there is no dispute in the evidence that plaintiff was discharged with instructions to return to UVA within seven days so she could be evaluated by a hand specialist. (Plaintiff's Response, Exhibit 2.) The doctors prescribed Percocet for pain relief, which plaintiff denies ever receiving.

Plaintiff returned to FCCW around midnight on June 2. Upon returning to FCCW, Joseph, the medical director at FCCW, ordered that she be taken to the prison's infirmary rather than being returned to the general prison population. Defendants have offered evidence that plaintiff's prescription for Percocet was not administered when she initially returned to FCCW because it was not been written by a physician at FCCW, in accordance with prison policy, and plaintiff had a

---

[3]Plaintiff also named PHS as a defendant in Count I, but in her Supplemental Memorandum in Opposition, plaintiff withdrew her § 1983 claim against PHS upon the apparent recognition that liability could not extend to this defendant on such a § 1983 claim under the doctrine of *respondeat superior*. (Dkt Rpt Document No. 81, p. 4.)

2

history of abusing narcotic medications. In lieu thereof, Joseph ordered that plaintiff be given Motrin 600 mg every 6 hours and Tylenol 750 mg every four hours.

On June 3, 2003, another prison physician, Patricia Eben, M.D. ("Eben") evaluated plaintiff's wrist. Dr. Eben noted in plaintiff's chart that "consult placed . . . needs to be seen within 7 days." (Plaintiff's Medical Records, Ex. 10, p. 4.) Dr. Eben also completed a "Consultation Form" in which she referred plaintiff to UVA for an orthopedic consultation. (Plaintiff's Response, Ex. 5.) At that time, Dr. Eben prescribed Percocet for pain relief.

Plaintiff stated that, although she continued to complain about her pain on June 4, 2003, Joseph did not provide her with pain medication. There is countervailing evidence from defendants that plaintiff was given Motrin and Percocet on June 4, 2003. (Defendants' Memorandum in Support, Exhibit 10, p. 6.)

On June 5, 2003, Joseph examined plaintiff's wrist. Joseph testified that the discharge instructions from UVA were not present in plaintiff's chart at that time, and she interpreted Eben's note as non-specific, meaning that plaintiff could be seen by *any* medical provider, not just a physician at UVA. Joseph wrote orders to discharge plaintiff from the infirmary and prescribed Motrin 600 mg twice per day. According to defendants, plaintiff was not discharged with Percocet because inmates in the general population were not permitted to receive narcotic pain medications. On June 6, 2003, plaintiff was discharged from the infirmary. According to defendants, plaintiff continued to receive Motrin 600 mg twice per day.

Plaintiff testified that on June 7, 2003 she sent word to "responsible individuals" that she needed to be returned to UVA by Monday, June 9, 2003, which was seven days after her initial evaluation. Plaintiff stated that when she received no response on June 11, 2003 she submitted a

3

sick call request form seeking an examination of her wrist and an x-ray.

There is evidence showing that plaintiff was given a 5-day supply of Motrin on June 9, 2003 and instructed to return the empty packets in order to obtain a pain medication refill. Defendants also offer evidence that it was not until June 10, 2003, that Joseph saw, for the first time, the UVA discharge instructions calling for a return to that facility within 7 days from the date of plaintiff's treatment in the ER.

According to plaintiff, she continued to suffer constant pain, yet by June 12, 2003 she had not been given pain medication. Moreover, plaintiff stated that a nurse at FCCW denied her requests to have her arm x-rayed and to see a doctor at that time. According to plaintiff, the nurse also informed her that Joseph had written orders for her to be evaluated by a doctor in three weeks, but that the orders did not provide for plaintiff's return to UVA.

Plaintiff revealed that on June 13, 2003, she was informed she no longer would be given Motrin for her pain, in response to which plaintiff filed an emergency grievance. Carver, who was on duty at the time the grievance was filed, responded in writing. (Defs' Mot, Exhibit 6.) Plaintiff asserts that Carver's response should be interpreted as denying her request because it was not considered an emergency. According to defendants, Carver's response was intended to inform plaintiff that she had not followed the procedure for obtaining a refill of her pain medication, and that she was advised to submit a self medication request.

On June 20, 2003, plaintiff filed another emergency grievance to which Carver also responded. Carver's written response informed plaintiff she needed to "IMS[4] her provider."

---

[4]The term "IMS" refers to the means by which inmates communicate with prison officials. (Defendants' Memorandum in Support, p. 11.)

4

(Defendants' Mt, Exhibit 7.)[5] Plaintiff offers that she had not received medical care for her injury since June 2, 2003, and, therefore, she did not believe that she even had a "provider" at the time. On June 20, 2003, plaintiff filed an "inmate request" to the warden essentially seeking medical attention. (Defendants' Memorandum in Support, Exhibit 10, p. 13.) The warden responded by indicating he was forwarding the request to the FCCW medical department.

On June 23, 2003, plaintiff was returned to UVA where she was evaluated by Michael E. Pannunzio, M.D., an orthopaedic specialist. Following his evaluation, Dr. Pannunzio concluded that plaintiff was suffering an "unstable fracture that demands surgical attention," that there had been a failure to return her to UVA within the ideal period of two weeks, and that plaintiff's fracture was beginning to form a malunion. (Pannunzio Deposition, pp. 25-26.) Pannunzio offered to clear his schedule so that he could perform surgery on plaintiff as soon as possible, and he scheduled surgery for June 25, 2003. Pannunzio provided the correctional officers escorting plaintiff with a prescription for Ultram, which, according to plaintiff, she never received.

According to plaintiff's evidence, Pannunzio was informed that the June 25 surgery would not be taking place, "due to lack of resources," which prompted him to call Joseph to express his concerns. (Pannunzio Deposition, p. 48.) According to Joseph, Pannunzio did not express any medical necessity for the surgery to take place on June 25, and she understood that the surgery could also be performed on June 26 or June 27. However, Joseph testified Pannunzio was not available to perform the surgery on those latter dates.

According to plaintiff's evidence, Pannunzio made Joseph aware that it was critical that she have the surgery as scheduled on June 25. He was of the view that plaintiff had sustained an acute

---

[5]Defendants note that the only contacts Carver had with plaintiff after June 5 were her responses to plaintiff's emergency grievances of June 13 and June 20, 2003.

5

fracture of her left wrist which resulted in a complicated injury that was so "unstable" as to "demand surgical attention." (Pannunzio Deposition, p. 25.) Joseph revealed the June 25 date was chosen based upon Pannunzio's schedule, not the fact that there was an urgency to perform the surgery or that a delay would have detrimental effects.

On June 24, 2003, Joseph submitted a request to approve plaintiff's surgery, and on June 25, 2003, the prison medical scheduler contacted UVA. The surgery was scheduled for July 30, 2003, with a pre-operative visit to take place on July 22, 2003. According to defendants, Joseph inquired about obtaining an earlier surgery date but none were available by that time on Pannunzio's calendar. Plaintiff has presented evidence that it was only then that Joseph learned that plaintiff would be released from confinement prior to July 30.

Plaintiff filed a grievance on June 30, 2003, in which she detailed the events which had taken place since her accident on June 2, 2003. According to plaintiff, the response she received was that she should contact Joseph to determine when her surgery would be scheduled.

On July 9, 2003, plaintiff submitted an inmate request form, and days later, she was directed to "fill in [a] sick call." (Amended Complaint ¶ 43.) Plaintiff filed another inmate request form with the medical director on July 11, 2003. Plaintiff finally received a response to that request on July 21, 2003, and she was informed that Joseph would formalize an appointment for the surgery.

Defendants have offered evidence suggesting that in an effort to schedule an earlier surgery date, Joseph directed that plaintiff be evaluated by another orthopedic specialist, Karen Prakash, M.D. ("Prakash"). Dr. Prakash evaluated plaintiff on July 17, 2003, and he recommended surgery to repair her condition. According to Joseph it was only after speaking with Prakash about plaintiff's case that she became aware of the risk of malunion associated with plaintiff's fracture.

6

On July 22, 2003 plaintiff was taken to see Pannunzio who was scheduled to perform her surgery on July 30, 2003, a date he believed was "about four weeks *after the ideal date* for surgical reconstruction." (Pannunzio's Deposition, p. 60, emphasis added.) Pannunzio concluded, after he had seen plaintiff on that date, that so much time had elapsed since she had broken her wrist that the benefits of surgery were outweighed by the potential harmful risks. In other words, Pannunzio was of the view that the bones in plaintiff's left wrist had healed to the point that he could not recommend surgical intervention as a beneficial treatment.

On July 29, 2003, plaintiff executed a form entitled "Refusal to Consent to Medical Treatment" in which she declined surgery based on Pannunzio's recommendation against surgery, notwithstanding Prakash's view that surgical fixation was a viable option. According to plaintiff, she was informed that she would be responsible for any problems with her wrist experienced after release, and she was released from FCCW on August 4, 2003. On the same day, plaintiff was evaluated once again by Pannunzio. At that time, Pannunzio determined that plaintiff had suffered a loss of mobility in her wrist and a loss of sensation in her fingers and left hand.

After being released, plaintiff's case was evaluated by retained medical experts Timothy Henshaw, M.D. ("Henshaw") and Charles A. Kessler, M.D. ("Kessler"). Henshaw, a specialist in internal medicine and rheumatology, reviewed plaintiff's medical records and the relevant deposition testimony. He opined that the treatment plaintiff received was inadequate and "fell below the standard of care for the State of Virginia." (Henshaw Medical Chart Review, p. 2.) Although Henshaw declined to offer any legal view about whether there was deliberate indifference, he opined that Joseph's conduct was "medically indifferent" to plaintiff's medical needs. Specifically, he was of the view that, despite the need for timely intervention for the

7

multiple fractures of her wrist bones, no follow up visit was scheduled within the recommended time period, and he could not find evidence she was given the medications prescribed. Henshaw further opined that this delay was exacerbated by a further delay in scheduling surgery with Pannunzio because, by that time, Pannunzio had informed Joseph of plaintiff's critical need for surgery by June 25, 2003. Moreover, he was of the view that by July 22, 2003, the only means by which plaintiff's condition could be corrected was by re-breaking the bones in her wrist. In addition, Henshaw noted that plaintiff's physical therapy was only "partially successful" and that she would continue to experience "chronic problem[s]" related to the malunion and osteoarthritis which she would not have suffered had her fracture been repaired in a timely manner.

Dr. Kessler, a specialist in internal medicine who reviewed plaintiff's medical records and relevant deposition testimony, tendered an expert report dated August 3, 2005 and testified in a deposition taken on August 18, 2005. Kessler was of the view that Joseph's failure to return plaintiff to UVA or otherwise obtain a second opinion from a specialist, and her failure to secure the surgery scheduled for June 25, 2003 violated the applicable Virginia standard of care and constituted deliberate indifference to her medical needs. Kessler further concluded with a reasonable degree of medical certainty that the inadequate treatment plaintiff received was the proximate cause of the malunion and osteoarthritis which have resulted in a loss of function and excessive pain.

## LEGAL PRINCIPLES

### Summary Judgment Standard

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving part[ies are] entitled to judgment as a matter of law." FED. R. Civ. P. 56(c); *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 259-60 (4th Cir. 2005). The moving party bears the initial burden of proof that there is an absence of any genuine issues of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it might affect the outcome of the case, and an issue of fact is "genuine" when it could cause a rational trier of fact to find in favor of the nonmoving party. *Anderson v. Liberty*, 477 U.S. 242, 248 (1986). However, the moving party is entitled to summary judgment as a matter of law when the nonmoving party has not established the existence of an essential element to that party's case. *Celotex*, 477 U.S. at 323. In such a case, there are no genuine issues of material fact because there has been a complete failure to establish an essential element to the nonmoving party's case. *Id.* When determining whether there is an issue for trial, the court must view any inferences drawn from the underlying facts in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

**Deliberate Indifference**

The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments." U.S. Const. Amend. VIII. In that connection, the Eighth Amendment not only proscribes excessive sentences, it also protects inmates from inhumane treatment and conditions. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). To succeed on an Eighth Amendment claim, a plaintiff must show that: (1) he has a serious medical need, and (2) prison officials acted with "deliberate indifference" to that need. *Johnson*, 145 F.3d at 167. A serious medical need is a medical need that is "sufficiently serious . . .

9

to require medical treatment" or is so obvious that even a layperson would recognize the need for a doctor's attention. *Brice v. Virginia Beach Correctional Ctr.*, 58 F.3d 101, 104 (4th Cir.1995); *accord Albritton v. Edwards*, 2005 WL 2777284, *5 (W.D. Va. 2005). Treatment that amounts to "deliberate indifference" is that which is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Burton*, 896 F.2d 848, 851 (4th Cir. 1990). Mere negligence or medical malpractice, that is treatment which falls below the applicable state law standard of care, does not rise to the level of an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Thus, a prison official cannot be held liable under § 1983 simply by failing to exercise ordinary or reasonable care which, if exercised, likely would have averted the harm to the plaintiff. *Farmer v. Brennan*, 511 U.S. 825, 844-845 (1994).

**State Law Negligence**

In order to establish a prima facie case of medical malpractice in Virginia, the plaintiff must produce evidence which establishes: (1) the applicable standard of care; (2) a violation of that standard; and (3) the violation was the proximate cause of the harm suffered. *See Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir.1982). Expert evidence is necessary to establish the standard of care. *See id.* at 346-47.

**Statue of Limitations**

Cases brought under § 1983, as well as those brought for recovery of damages for medical negligence under Virginia law ordinarily are governed by the applicable Virginia statute of limitations for personal injuries. VA. CODE ANN. § 8.01-243(A); *CG6 Concrete Specialists, Inc. v. Dept' Of Police*, 2004 WL 2203451 * 2, n.5 (W.D. Va. 2004) (Conrad, J.) (unpublished opinion),

10

*aff'd sub nom. Liggins v. Police Dep't, Town of Berryville*, 124 Fed Appx. 776 (4th Cir. 2005); *see* 42 U.S.C. § 1988(a) (authorizing federal courts to borrow state limitations periods when they are not inconsistent with federal law). Nevertheless, actions relating to the conditions of confinement brought by persons confined to state or local correctional facilities cannot be brought unless all available administrative remedies are exhausted and must be filed within the later of one year of the date of their accrual or six months after administrative remedies have been exhausted. VA. CODE ANN. § 8.01-243.2.

Moreover, all claims "cognizable against the Commonwealth" under The Virginia Tort Claims Act, VA. CODE ANN. § 8.01-195.1 *et seq.* must first proceed on a notice of claim conforming to VA. CODE ANN. § 8.01-195.6, and then within eighteen months of the filing of that notice, or forever be barred. VA. CODE ANN. § 8.01-195.7.

## CONTENTIONS OF THE PARTIES

### Deliberate Indifference

#### 1. Nurse Lora Carver

***Defendants' Contentions***

Defendants argue that Carver had no verbal communication with plaintiff on June 13, 2003 or June 20, 2003, the two dates on which plaintiff alleges Carter was deliberately indifferent to her medical needs. Defendants believe the evidence clearly shows that when plaintiff filed the emergency grievance on June 20, 2003, Carver was not in a position to provide plaintiff with the information requested, and that it was reasonable, as a matter of law, for Carver to have responded to plaintiff's grievance with instructions on how to obtain the information sought. Defendants ask the court to enter judgment as a matter of law in Carver's favor on plaintiff's § 1983 claim set forth

11

in Count I. (Defendants' Memorandum in Support, pp. 22-23.)

*Plaintiff*

Plaintiff contends that the emergency grievance she filed on June 20, 2003 certainly informed Carver of the fact that she was not receiving the treatment recommended at UVA. Plaintiff further points out that Carver has admitted to understanding from plaintiff's grievance that the matter was very time sensitive, yet she did nothing more than respond in writing to the grievance. Plaintiff offers that Carver's decision not to take some other form of action on her complaint, if believed by the jury, could be found to constitute deliberate indifference. (Plaintiff's Reply Memorandum in Opposition, pp. 3-5.)

### 2. Dr. Georgette Joseph

*Defendants*

Defendants take the position that Joseph's failure to ensure plaintiff was returned to UVA within the recommended seven day time period resulted from her simple failure to see the discharge instructions until June 10, 2003, and this does not constitute an act of deliberate indifference. Defendants also take the position that Joseph's decision to cancel the surgery scheduled for June 25, 2003 was not deliberately indifferent to plaintiff's medical needs because Joseph was not made aware how critical the timing of surgery was to her treatment. Rather, defendants contend that the evidence shows Joseph followed normal protocols relating to the submission of a request for non-emergency surgery, which in this case occurred on June 24, and Joseph received approval on June 25. Essentially, defendants offer that Joseph merely exercised her best judgment based on what she knew at the time the new surgery date was scheduled, and in the meantime also scheduled an appointment with Dr. Prakash. In that connection, defendants argue that this case boils down to a

12

disagreement or debate between medical experts, namely Pannunzio and Prakash, about whether surgery in late July was even necessary or recommended, and the fact plaintiff chose to follow Pannunzio's recommendation points to the absence of any need for surgery which defeats, as a matter of law, any claim for deliberate indifference to her medical needs.

Additionally, defendants contend that before plaintiff was released from FCCW, Joseph made reasonable efforts to schedule surgery and to inform plaintiff of the risks associated with surgery as opposed to alternate forms of treatment. Defendants also point to the fact that plaintiff never contacted Joseph after she was released from FCCW as evidence revealing an absence of a serious medical need. Along those lines, defendants concede that plaintiff's injury to her left wrist was initially a serious medical condition; however, they assert that, after the emergency room physician performed the reduction on June 2, 2003, the condition was no longer objectively serious. Defendants assert that there is no dispute in the evidence that plaintiff's condition remained serious after June 2, only to the extent that she was continuing to experience pain. Defendants contend that Joseph acknowledged plaintiff's need for pain management, and continued to provide her with the types of pain medications that were permitted under regulations restricting inmate access to controlled substances.

Defendants further challenge whether plaintiff has established an Eighth Amendment violation because they do not believe she has shown sufficient facts from which a jury could determine she has been injured as a consequence of the medical care she received. Specifically, defendants note that plaintiff's evidence is speculative as to whether a timely surgery would have prevented a malunion or left her with a better outcome. Defendants offer that the court should conclude, as a matter of law, that the difficulties plaintiff experiences with her left wrist result

13

from suffering the initial a fracture and not from any failure to have surgery. Specifically, defendants note that although plaintiff claims that the malunion of the bones in her wrist has caused her loss of grip strength and function, her journal reveals that she had these problems prior to the June 2, 2003 accident. Additionally, defendants take the position that the medical evidence shows the pain plaintiff suffers in her left wrist is caused by arthrosis, not any malunion, and that even Dr. Pannunzio found that plaintiff suffers only moderate limitations and has a good range of motion and flexibility.

*Plaintiff*

Plaintiff asserts that there are disputes in the material evidence concerning: a) whether there was deliberate indifference irrespective of whether Joseph was aware of the UVA discharge orders directing that plaintiff receive an orthopedic consultation within seven days of the initial treatment; b) whether Joseph had knowledge of the risks to plaintiff by delaying surgery; and c) whether Joseph was precluded from scheduling plaintiff for surgery on June 25, 2003 due to bureaucratic restraints.

Plaintiff contends that the opinions expressed by Drs. Kessler, Henshaw, and Pannunzio are sufficient to establish genuine issues of material fact that Joseph acted with deliberate indifference to her serious medical need, and that this deliberate indifference was the proximate cause of plaintiff's malunion, osteoarthritis, excessive pain, and loss of function in her wrist, irrespective of the degree of that loss. In that connection, plaintiff points to Pannunzio's testimony that her fractured wrist was a serious medical condition which warranted medical treatment beyond that which she initially received at UVA on the day of the accident. Additionally, plaintiff points to Henshaw's testimony showing that she would have "had to have urgent surgery if she were to have

14

correct reapproximation of her joint." (Henshaw Deposition, p. 37.) Plaintiff certainly believes that both Kessler and Henshaw provide evidence, which if believed, would permit a jury to find that Joseph not only violated the appropriate Virginia standard of care, but also that she was deliberately indifferent to plaintiff's serious medical need.

**State Law Negligence Claim**

*Defendants*

Defendants seek summary judgment on plaintiff's state law medical negligence claim essentially on three grounds. First they assert that plaintiff's claim is barred by the applicable statute of limitation, specifically VA. CODE ANN. § 8.01-243.2, which provides that claims by confined persons must be brought within one year of the date the cause of action accrued. Defendants note that plaintiff alleges that Joseph was negligent during the period between June 2, 2003, the date of the accident, and August 4, 2003, the date she was released from confinement. This action was not filed until August 27, 2004, which is beyond one year from the last date plaintiff contends Joseph was negligent. Thus, defendants conclude that plaintiff's malpractice claim against Joseph and, vicariously, against PHS should be dismissed as time-barred.

Second, defendants seek summary judgment on the medical negligence claim on the principle of election of remedies. They point out that plaintiff's allegations of negligence/malpractice are based on identical conduct upon which plaintiff asserts her Eighth Amendment claims pursuant to §1983. Defendants believe these claims are mutually exclusive because a showing of deliberate indifference would exclude the entire notion of medical negligence.

Third, defendants object to and seek to exclude the expert testimony offered by Drs.

15

Henshaw and Kessler. They believe the court should not receive the evidence of these physicians concerning the applicable standard of care and whether Joseph violated it because defendants offer that the applicable standard is one for orthopedic surgeons and these doctors are not orthopaedic surgeons. Defendants further note that neither Henshaw nor Kessler have experience working in a correctional facility, and as such, they are not in a position to evaluate Joseph's conduct as a correctional facility physician.

***Plaintiff***

Plaintiff opposes dismissal on statute of limitations grounds. While not raised by defendants, plaintiff first offers that this is not a case subject to the constraints set forth in the Virginia Tort Claims Act, VA. CODE ANN. § 8.01-195 *et seq.*[6] This is so because plaintiff asserts she has not presented any claim under the Virginia Tort Claims Act.

Likewise, plaintiff takes the position the period of limitations fixed in § 8.01-243.2 of the Code of Virginia has no application because she was not a confined person when she instituted this action. Moreover, plaintiff posits that once released, she could not exhaust administrative remedies available to confined persons as required under § 8.01-243.2. That being the case, plaintiff relies on the provisions of VA. CODE ANN. § 8.01-243(A) and contends that both her state law and §1983 claims were filed within the time period prescribed.

In addition, plaintiff contends that both Henshaw and Kessler are qualified to render opinions about the Virginia standard of care, whether Joseph complied with that standard, and about whether Joseph's conduct was deliberately indifferent to plaintiff's serious medical need. Plaintiff suggests, after all, that both Henshaw and Kessler are experts in the very field of practice

---

[6]After oral argument, plaintiff was permitted to file a supplemental brief addressing issues relating to the statute of limitations as it pertains to her state law negligence claim.

16

occupied by Joseph, and their evidence, when coupled with that of Pannunzio, would permit a trier of fact to determine that Joseph is liable on both plaintiff's federal and sate law claims because their evidence, in combination, demonstrates that plaintiff's medical condition was serious and that Joseph's treatment fell below federal and state law standards which resulted in permanent injury to plaintiff. The value of that injury, according to plaintiff is a matter for the jury to determine.

## FINDINGS, CONCLUSIONS AND RECOMMENDATIONS

### 1. Nurse Lora Carver

There are no genuine issues of material fact related to whether Carver was deliberately indifferent to plaintiff's serious medical need. None of the opinions offered by Kessler, Henshaw, and Pannunzio specifically address Carver's conduct. Moreover, the undisputed evidence reveals that Carver was a nurse working the night shift at FCCW's medical department, and that, in her role, she could only provide emergency medical care, and was required to pass along requests for non-emergency medical treatment. It was entirely reasonable, as a matter of law, for Carver to respond to plaintiff's June 20 grievance by informing her that her request was not an emergency and she would need to contact her medical provider. In other words, Carver's conduct does not rise to constitutional proportions, as a matter of law.

Carver's motion for summary judgment should be GRANTED, and it is so RECOMMENDED.

### 2. Dr. Georgette Joseph

Suffice it to say, there is sufficient evidence upon which a reasonable jury could conclude that plaintiff's medical condition, during the entire period under consideration, was serious. It would be a strained reading of the evidence from Drs. Pannunzio, Kessler and Henshaw to

conclude otherwise, at least as a matter of law. The references to the condition as being "unstable," so much so that it "demand[s] surgical attention" are sufficient to survive summary judgment on the question of the seriousness of plaintiff's medical need. (See Pannunzio Deposition, p. 25.) The fact that plaintiff elected to follow Pannunzio's advice and not have surgery does not denigrate the severity of her need. Not that it necessarily would, but a jury easily could conclude on this evidence that it would be unreasonable to proceed with surgery once the window of opportunity for its success had passed. This ground for summary judgment is without merit.

Moreover, plaintiff has produced more than ample expert evidence upon which a jury could conclude that Joseph was deliberately indifferent to her serious medical need. A fair reading of Pannunzio's deposition about what Joseph knew and when, together with the evidence offered by Henshaw and Kessler, certainly would be sufficient to sustain such a finding. Certainly, mere negligence does not support a § 1983 claim, but when viewed as a whole, the evidence of plaintiff's medical experts in this case, both treating and specially retained, shows that Joseph's conduct failed to comply with the § 1983 standard, mainly because there was a time when, according to these witnesses, she knew or should have known that surgery was needed and took no action, or at least inappropriate action to secure it.

Moreover, all of plaintiff's medical witnesses are qualified to render opinions on the subject of both deliberate indifference and medical negligence. Mainly, Pannunzio is a fact expert with medical opinions concerning necessity. Kessler and Henshaw possess credentials in Joseph's field of practice, and it is immaterial that neither doctor had experience practicing in a correctional facility. Kessler and Henshaw know the Virginia standard of care and they are able to testify, as internists, with respect to whether Joseph's conduct was medically, if not legally, indifferent.

18

**State Law Negligence Claim**

There is no question in the undersigned's mind that the appropriate period of limitation applicable here for both plaintiff's federal and state law claims is the personal injury provisions of VA. CODE ANN.§ 8.01-243(A). There is no assertion that this is a claim brought under the Virginia Tort Claims Act, and the evidence is not in dispute that plaintiff was not a "confined" person when she instituted this action. In fact, it seems agreed that her cause of action did not accrue until her treatment by Joseph ceased, and that was when she was released from confinement. For the same reasons Pannunzio, Kessler and Henshaw are qualified to opine on matters relating to plaintiff's § 1983 claim, they may do so with respect to plaintiff's state law medical claim. *See* VA. CODE ANN. § 8.01-581.20. The undersigned concludes that the expert opinions of Kessler and Henshaw are properly before the court as evidence and that there are genuine issues of material fact relating to whether Joseph's medical treatment fell below the applicable standard of care. In turn, there is evidence upon which it could be determined that PHS is vicariously liable for Joseph's conduct under the doctrine of *respondeat superior*. *Giant of Maryland v. Enger*, 257 Va. 513, 516 (1999); *Sanchez v. Medicorp Health System*, 270 Va.304-05 (2005).

**SUMMARY**

For the foregoing reasons, the undersigned hereby RECOMMENDS that the presiding District Judge enter an order GRANTING, in part, defendants' Motion for Summary Judgment on behalf of Lora Carver and DISMISSING plaintiff's claim against her, but DENYING the motion in all other respects as to plaintiff's state law claim against Joseph and PHS and her federal claim under § 1983 against Joseph.

The Clerk is directed immediately to transmit the record in this case to the presiding District

19

Judge. Both sides are reminded that, pursuant to Rule 72(b), they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: /s/ [signature]
United States Magistrate Judge

12-08-05
Date