CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
JAN 2 6 2006 C'ville
JOHN F. CORCORAN, CLERK
BY: /s/ [signature]
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| PAMELA DOTSON,<br><br>        *Plaintiff,*<br><br>v.<br><br>LERLA GEORGETTE JOSEPH, M.D.,<br>ET AL.,<br><br>        *Defendants.* | CIVIL ACTION NO. 3:04-CV-10099<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

  This action involves a former prisoner's Eighth Amendment and state law negligence claims against a prison medical service and its employees. The matter is presently before the Court on Defendants' Motion for Summary Judgment. The case was referred to the presiding United States Magistrate Judge for proposed findings of fact and a recommended disposition, and the Magistrate Judge has filed a Report and Recommendation recommending that the Motion be granted in part and denied in part. After a thorough examination of the entire record in this case, including the Report and Recommendation and the objections thereto, the Court will grant the Motion in part and deny it in part, for the reasons set forth below.

## I. BACKGROUND

  At the time of the events which led to this lawsuit, Plaintiff Pamela Dotson ("Dotson") was incarcerated at the Fluvanna Correctional Center for Women, in Fluvanna County, Virginia. On June 2, 2003, Dotson fell from the top bunk bed in her prison cell and injured her left wrist. Prison officials transported Dotson to the University of Virginia Hospital ("UVA"), where

Emergency Department physicians diagnosed her with a fracture of the left radius and left ulna, as well as nerve injuries. The physicians treated Dotson, prescribed Percocet for her pain, and released her with written discharge instructions to return to UVA within seven days to see a specialist, Dr. Pannunzio ("Pannunzio"). Hospital personnel gave these instructions to the guards accompanying Dotson. *See* Pannunzio Dep. at 15.

Dotson remained in the prison infirmary for several days. For pain relief, she first received Motrin and Tylenol, rather than the Percocet prescribed. On June 3, 2005, another prison physician, Patricia Eben, saw Dotson and examined her wrist. Dr. Eben wrote in Plaintiff's chart that a consult was placed, and that Plaintiff "needs to be seen within 7 days." Def.'s Mem. Supp. Summ. J., Ex. 10, p. 4. Dr. Eben also completed a consultation form referring Plaintiff to UVA for an orthopedic consultation, and prescribed Percocet for pain relief. Pl.'s Resp., Ex. 5. Plaintiff alleges that she did not receive any pain medication on June 4, 2005, but Defendants have produced records which assert that she received two Percocets. Def.'s Mem. Supp. Summ. J., Ex. 10, p. 6.

Defendant Dr. Lerla Joseph ("Joseph"), Plaintiff's main care provider, examined Plaintiff's wrist on June 5, 2003. Joseph prescribed Motrin and Tylenol for Plaintiff's pain relief after her discharge from the infirmary.[1] According to Joseph, it was not until June 10, 2003, that she understood Dr. Eben's consultation request, which called for Plaintiff to return to see an specialist within seven days of her first treatment in the emergency room. Joseph Dep. at 36.

Dotson was sent back to her cell on June 6th, 2003. On June 7th, five days after her

---

[1] There is a factual dispute about the amount of Tylenol and Motrin that Joseph prescribed. *See* Pl.'s Obj. to Magistrate's Report and Recommendations.

injury occurred, Dotson sent an inmate request form ("IMS") to the prison's medical department to inform medical personnel that she needed to return to UVA for a follow-up appointment, but received no response. Dotson Dep. at 67. On June 12, she returned to the infirmary, asked for an X-ray for her swollen and painful arm, and reminded the nurse in charge that she was supposed to have another appointment at UVA. According to Dotson, the nurse refused her request for an X-ray, told her that there were no orders for her to return to UVA, and said that no doctor would see her at that time. Dotson Dep. at 65–66.

On June 13, 2003, Plaintiff ran out of her 5-day supply of Motrin, which had been provided to her on June 9. When she went to refill the supply at the prison "pill line," there was no medicine for her. Plaintiff then filled out an emergency grievance form requesting more medication. Defendant Nurse Lora Carver ("Carver") responded to the grievance. Def.'s Mem. Supp. Summ. J., Ex. 6. Carver was a nurse who worked the night shift at the medical department in the prison. She was authorized to dispense only emergency medical care, and had to pass along requests for non-emergency medical treatment. See Carver Aff. at 2. Carver wrote a response to Plaintiff's grievance the same day, indicating that the situation did not qualify as an emergency, and that Dotson needed to fill out a "self-med" form in order to receive her Motrin. Plaintiff was without medication for a few days because of this incident, and suffered serious pain as a result. See Def.'s Mem. Supp. Summ. J., Ex. 4, at 12.

On June 20, 2003, Plaintiff filed another emergency grievance, asking why she had not been taken back to UVA to see a specialist as her discharge instructions had ordered. Carver responded in writing that an emergency grievance form was not the correct means of resolving Plaintiff's problem, and instead, Plaintiff should IMS her provider. Def.'s Mem. Supp. Summ.

3

J., Ex. 7. Plaintiff claims that she did not know who her provider was. On the same day, Plaintiff sent an inmate request form to the warden and informed him of her medical problems. The warden forwarded the message to the medical department for a response on July 2nd. Def.'s Mem. Supp. Summ. J., Ex. 10, at 12. Plaintiff alleges that during this time, she continued to suffer serious pain from her arm.

On June 23, 2003, three weeks after her initial injury, Plaintiff returned to UVA, where she saw Pannunzio, an orthopedic specialist. Pannunzio found that Plaintiff's fracture was unstable and beginning to form a malunion. He decided that she needed surgery. Pannunzio felt that the surgery should ideally have been performed within two weeks of the injury, but now should be performed as soon as possible. He scheduled surgery for June 25, 2003. Pannunzio Dep. at 25–26. He also prescribed a pain medication called Ultram, which, according to Plaintiff, she never received. Def.'s Mem. Supp. Summ. J., Ex. 4, at 19.

Later, Pannunzio received word from the prison that due to "lack of resources," the surgery could not take place on June 25, 2003. Pannunzio Dep. at 48. He then contacted Joseph on June 24 to inform her that 1) the emergency room had initially recommended that Plaintiff return to UVA within seven days; 2) it was possible that surgery could have been avoided had Plaintiff returned within seven days; and 3) that "[Dotson] was well on her way to making a malunion and any delay in her surgical treatment of this already complicated injury [sic] would likely worsen the overall outcome in my opinion." *Id.* at 51. The two doctors had a long conversation. Joseph recalls only that Pannunzio informed her that it was important for Dotson to have the surgery. Joseph Dep. at 11–12. Later, the prison medical scheduler contacted UVA, and the surgery was scheduled for July 30, 2003, with a pre-operative visit to take place on July

4

22, 2003. Joseph asserts that she attempted to secure an earlier surgery date, but was unable to do so. Def.'s Mem. Supp. Summ. J., Ex. 5.

Plaintiff alleges that she filed another grievance form on June 30, 2003, describing the above events, and was told on July 1, 2003, that she should ask Joseph when surgery would be scheduled. Plaintiff also claims that she had an appointment with a nurse on July 3, 2003, but was not informed when the surgery would take place. Am. Compl. ¶ 41–42. On July 9, 2003, Plaintiff sent an IMS form to the medical department and several days later was directed to "fill in [a] sick call." She also sent another inmate request form to the medical director on July 11, 2003. Plaintiff received a response to that request on July 21, 2003, informing her that Joseph would finalize the date for the surgery. Am. Compl. ¶ 43.

Joseph also directed that Dotson have an appointment with another orthopedic specialist, Dr. Karen Prakash, apparently in an effort to schedule an earlier surgery date. Dr. Prakash examined Plaintiff on July 17, 2003, and recommended surgery. Joseph claims that it was only after speaking with Dr. Prakash that she became aware of the potential problem of malunion. Joseph Dep. at 18.

On July 22, 2003, Plaintiff saw Dr. Pannunzio again for her pre-surgery visit. However, the doctor concluded that because so much time had passed since Plaintiff had broken her wrist, the benefits of surgery were outweighed by the risks. Thus, he no longer recommended surgery as an option. *See* Pannunzio Dep. at 60.

On July 29, Plaintiff signed a form entitled "Refusal to Consent to Medical Treatment." In the form she declined surgery based on Dr. Pannunzio's recommendation, despite Dr. Prakash's opinion that surgery could still be performed. Plaintiff was released from prison on

5

August 4, 2003. Dotson claims that she has suffered excess pain and mental anguish because of Defendants' behavior, and has testified that she now suffers from osteoarthritis and some loss of strength in her wrist because of the malunion of her wrist bones. *See* Dotson Dep. at 114.

Plaintiff's case was later evaluated by retained physicians. First, Dr. Charles Kessler, a specialist in internal medicine, reviewed Plaintiff's medical records and relevant deposition testimony. He asserts that Joseph's failure to return Dotson to UVA within seven days of her injury, or timely seek a second opinion from a specialist, constitutes a breach in the applicable standard of care. Dr. Kessler also testified that Plaintiff's inadequate treatment caused Plaintiff's malunion and osteoarthritis, which in turn have caused Plaintiff pain and loss of function in her left wrist. Kessler Report at 2.

A second retained physician, Dr. Timothy Henshaw, a specialist in internal medicine and rheumatology, also reviewed Plaintiff's records and other relevant testimony. He found that the malunion of Plaintiff's wrist bones could have been avoided with appropriate care and timely surgery. Dr. Henshaw also believes that the malunion has caused Plaintiff's osteoarthritis. Finally, Dr. Henshaw concluded that Defendants were "clearly aware" of Plaintiff's need for surgery and a visit with a specialist. Henshaw Report at 2.

Plaintiff commenced this action on August 27, 2004, alleging that the individual Defendants Carver and Joseph violated her Eighth Amendment right to be free of cruel and unusual punishment, and that Joseph and Prison Health Services, Inc. ("PHS") negligently deviated from the applicable standard of care in the medical treatment of Plaintiff by failing to arrange Dotson's follow-up visit to Pannunzio, failing to respond to Dotson's continued requests for treatment, failing to properly medicate Dotson for her pain, and disregarding Plaintiff's

serious medical condition. Defendants moved for summary judgment, and the Magistrate issued a Report and Recommendation recommending that the Motion be granted with respect to Defendant Carver and denied as to all other Defendants. Both Plaintiff and Defendants have filed objections to the Magistrate's Report, and thus this Court will conduct a de novo review of the case. *See Orpiano v. Johnson*, 687 F.2d 44 (4th Cir. 1982).

## II. ANALYSIS:

### A. Standard of Review

The principal purpose of summary judgment is to save the time and resources of both litigants and the Court by allowing a judgment on the law where no genuine issue of fact exists for a jury. *See* Charles Alan Wright and Arthur R. Miller, 10A Federal Practice and Procedure § 2712 (3d ed. 1998 & Supp. 2005). In a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Because the burden is on the moving party, the Court will view all evidence presented, and all inferences drawn from that evidence, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir. 1995). However, when the moving party makes a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The Court will not weigh the evidence, but instead will merely determine whether a genuine issue of material fact remains for the jury. *Id.* at 249.

Case 3:04-cv-10099-NKM-BWC   Document 89   Filed 01/26/06   Page 7 of 13   Pageid#: 1141

### B. Eighth Amendment Claim

It is well-settled law that the Eighth Amendment imposes certain duties upon prison officials to ensure that conditions of confinement are humane. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Accordingly, the Eighth Amendment requires that prison officials provide inmates with adequate medical care. *Id.*; *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). However, an accidental or unintended failure to provide medical care will not violate the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citing *Estelle*, 429 U.S. at 104). In order to succeed on an Eighth Amendment claim, a plaintiff must show both that 1) he or she had a serious medical need; and 2) defendants were deliberately indifferent to that need. *See Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991) (internal citations omitted).

*1. Serious Medical Need*

To survive summary judgment on her Eighth Amendment claim, Dotson must first produce evidence that she suffered from a "serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). Pain itself (*id.* at 1381, n.6), or even mental pain (*Shrader v. White*, 761 F.2d 975, 979 (4th Cir. 1985)) can constitute a serious injury for purposes of the Eighth Amendment, if the pain is so significant as to rise to the level of a constitutional violation.

Plaintiff has testified that she suffered excessive pain and mental anguish as a result of Defendants' treatment (or lack thereof) of her broken wrist. Furthermore, Dotson now suffers from osteoarthritis, and claims to continue to suffer some pain and a loss of strength in the injured wrist. Plaintiff has produced two experts who have testified that the delay in surgery resulted in the otherwise preventable malunion of Plaintiff's wrist bones, which has in turn

8

caused osteoarthritis and additional pain. On the other hand, Defendants' expert testified that the malunion probably did not cause osteoarthritis. The conflicting evidence creates a genuine issue of material fact as to whether Plaintiff suffered and continues to suffers from a serious injury.

2. *Deliberate Indifference*

Second, to survive a motion for summary judgment, a genuine issue of fact must remain as to whether the defendant was deliberately indifferent to the plaintiff's needs. To exhibit deliberate indifference, a defendant must have a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Mere medical malpractice, or even gross negligence, will not suffice to show deliberate indifference. *Estelle v. Gamble*, 239 U.S. 97, 106 (1978). Instead, the Eighth Amendment standard requires that a prison official both "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

*i) Dr. Lerla Joseph*

Plaintiff argues that Joseph knew of and disregarded the risk of serious injury to Dotson and her wrist, failing to properly medicate her, return her to UVA within seven days of her first visit, and schedule her surgery as soon as was possible. In response, Joseph contends that she did not realize that Plaintiff was to return to UVA after her first emergency room visit. However, it is undisputed that Plaintiff was discharged with instructions from the emergency to return to UVA within seven days, and that another physician, Dr. Eben, wrote similar instructions in Plaintiff's chart, which Joseph apparently saw on June 5, 2003. Nonetheless, Joseph did not facilitate Plaintiff's return to UVA until three weeks after her injury, on June 23, 2003.

9

Joseph also claims that she did not know of the risk of malunion until July 17, 2003, when Dr. Prakash examined Plaintiff. However, Pannunzio has testified that he specifically called Joseph on June 24, 2003 to warn her of the risks of postponing surgery (which included malunion) and both doctors recall that they had a long talk about Dotson. Nonetheless, surgery was not scheduled until more than a month after their conversation.

Thus, both Plaintiff and Defendant have produced evidence that reflects on Joseph's alleged deliberate indifference. In a summary judgment motion, however, the Court's duties do not include weighing the evidence that the parties have set forth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Instead, the Court is to determine whether a genuine question of material fact exists for trial. *Id.* Here, Joseph's credibility is at issue. When all the facts are construed in the light most favorable to Plaintiff, the evidence that Joseph had possibly seen papers which noted that Plaintiff needed to return to UVA within seven days of her ER visit, and that Pannunzio called Joseph to discuss the urgency of surgery with her, demonstrate that it is within the realm of possibility that Joseph was alerted to Plaintiff's serious need and chose to disregard that need, despite her testimony otherwise. "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56(e), advisory committee's note (1963). A fact finder could draw different inferences about Joseph's state of mind from the evidence at hand, and therefore a grant of summary judgment would be improper. *See Morrison v. Nissan Co., Ltd.*, 601 F.2d 139 (4th Cir. 1979) ("even though there may be no dispute about the basic facts, still summary judgment would be inappropriate if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts.") The question of

10

whether Joseph was deliberately indifferent— i.e., knew of and disregarded Plaintiff's serious medical need— requires an evaluation of Joseph's credibility, and presents a genuine issue of material fact, properly resolved at trial. *See Anderson*, 477 U.S. at 250.

*ii) Lora Carver*

Defendants have produced evidence that Carver was merely performing her duties as an emergency nurse when she responded to Dotson's grievances. She was unable to dispense pain medication, and therefore directed Dotson to file a self-medication form. Furthermore, as to Dotson's second grievance, Carver's duties did not include scheduling appointments at UVA, and thus Carver told Dotson to contact someone who could do so. Plaintiff has offered no evidence in response. Therefore, the Court finds that Carver was not deliberately indifferent to Plaintiff's serious medical need, and will grant summary judgment as to the Eighth Amendment claim against her.

## C. State Law Negligence Claim

Plaintiff has also alleged that Joseph and PHS were negligent in her medical care. As a preliminary matter, the Court will adopt the Magistrate's finding that the applicable Virginia statute of limitations is the general personal injury statute, which allows the filing of an action two years from the date that the cause of action accrues. Thus, Plaintiff's action is timely. Va. Code. Ann. §8.01-243; *see also Shelton v. Angelone*, 148 F. Supp. 2d 670 (W.D. Va. 2001) (holding that the appropriate statute of limitations for a § 1983 suit claiming a violation of the Eighth Amendment is the "general or residual statute for personal injury actions.").

A successful medical malpractice claim under Virginia law will 1) establish the applicable standard of care, 2) demonstrate that the standard was violated, and 3) show causation

11

between the violation and the harm alleged. *Waffen v. United States Dep't of Health & Human Serv.*, 799 F.2d 911, 915 (4th Cir. 1986) (citing *Fitzgerald v. Manning*, 679 F.2d 341, 346 (W.D.Va. 1982)). Plaintiff has produced the testimony of two experts, who have proffered that Joseph violated the applicable standard of care, and that her behavior was a proximate cause of Plaintiff's malunion, excess pain, and osteoarthritis. Defendant has produced testimony countering this evidence. The weighing of the evidence is a job for the jury, not the Court, and therefore, the Court finds that a genuine issue of material fact remains as to the negligence claim against Joseph. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[2]

Furthermore, the Court finds that summary judgment is also precluded as to PHS. Virginia law recognizes the theory of *respondeat superior*. Thus, "an employer is liable for the tortious acts of its employee if that employee was performing the employer's business and acting within the scope of the employment when the tortious acts were committed." *Giant of Maryland, Inc. v. Enger*, 515 S.E.2d 111, 112 (1999). Joseph appears to have been an employee of PHS, acting within the scope of her duties, at the time of this event. Therefore, PHS may be liable under the theory of *respondeat superior*, and the Court will not grant summary judgment for the negligence claim.

### III. Conclusion

Accordingly, the Court will adopt the Report and Recommendation of the Magistrate, as modified by this Opinion. The Motion for Summary Judgment will be granted in part and denied

---

[2] Joseph argues that if she was deliberately indifferent, then she could not have been negligent as a matter of law, because negligence does not require intent. However, Plaintiff is not precluded from bringing both claims. *Cf. Columbia Cas. v. Westfield Ins. Co.*, 378 F.3d 424 (4th Cir. 2004); *Grayson v. Peed*, 195 F.2d 692 (4th Cir. 1999) (plaintiffs brought both negligence and deliberate indifference claims).

in part: summary judgment will be granted as to Lora Carver, but denied as to all other Defendants and claims. An appropriate order shall issue this day.

ENTERED: _____
United States District Judge

Date: January 26, 2006

13